UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Trout Brook South Condominium Association,

                              Plaintiff,          Civ. No. 12-2888 (RHK/JSM)

v.                                             **MEMORANDUM OPINION AND ORDER**

Harleysville Worcester Insurance Company,

                              Defendant.

---

Karen K. Kurth, Barna, Guzy & Steffen, Ltd., Minneapolis, Minnesota, for Plaintiff.

Katherine A. McBride, Andrew D. Deutsch, Leatha G. Wolter, Meagher & Geer, PLLP, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

This insurance-coverage action arises out of hail damage sustained by a townhome development, Plaintiff Trout Brook South Condominium Association ("Trout Brook"), in 2010. Trout Brook alleges that its insurer, Defendant Harleysville Worcester Insurance Company ("Harleysville"), failed to pay all of the damages it is entitled to recover under its policy. Presently before the Court is Harleysville's Motion for Summary Judgment. For the reasons that follow, the Court will deny its Motion.

## BACKGROUND

Most of the relevant facts are undisputed; where disputed, they are recited below in the light most favorable to Trout Brook.

I.   **The parties and the policy**

Trout Brook comprises eighteen buildings, each containing between four and eight townhomes, in Elk River, Minnesota. At all relevant times, the buildings were insured under a Harleysville policy (the "Policy") providing (in pertinent part) coverage for "direct physical loss" to "covered property." In the event of a loss to covered property, the Policy obligated Harleysville to pay for its "replacement cost," defined as the lesser of (1) "the cost of repair or replacement with similar materials for the same use and purpose, on the same site" or (2) "the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable."

II.  **The hail storms and the dispute over the amount of loss**

In July 2009, a hail storm struck the Elk River area, causing damage to Trout Brook's buildings. It submitted a claim to Harleysville, which determined there was damage to the flashings, vents, and valleys on the buildings' roofs, but not to the roofs' shingles. Believing there was shingle damage, Trout Brook asked Harleysville for re-examination; Harleysville hired an engineering firm, Haag Engineering ("Haag"), to do so. Haag reinspected the roofs on June 25, 2010, but that same day, another hail storm struck the area and caused further damage. Trout Brook then submitted a second claim to Harleysville. Haag once again inspected the roofs, this time determining (among other things) that there had been some, but not "significant," damage to the roof shingles. It estimated total repair costs of approximately $270,000, of which $21,000 was allocated for roof repairs. Harleysville promptly paid this amount to Trout Brook.

Trout Brook did not agree with Harleysville's assessment and hired its own expert, First Rate Construction ("First Rate"), to evaluate the roofs and prepare a repair estimate. First Rate noted "large hail impacts" that had substantially damaged the roofs' vents, flashings, and shingles, and accordingly it proposed replacing the roofs in their entirety, at a cost of more than $800,000. Harleysville disagreed with this assessment, and the parties could not reach an accord on the scope of damage and the resulting repair costs. Trout Brook then demanded an "appraisal" under the Policy.[1]

After examining the buildings, the appraisal panel unanimously determined on July 21, 2011, that Trout Brook was entitled to an additional $81,765.50 in damages. The panel's award was extremely cursory and neither itemized the damaged property nor addressed precisely how the award was calculated. Nor did the award specify whether the additional damages were predicated on replacement of the roofs in their entirety, or rather only upon replacement of damaged shingles.[2] The award simply provided that the additional sum was for the "gross loss" determined by the appraisal panel, minus Harleysville's previous payment.

---

[1] The Policy provides that when the parties cannot agree on the amount of a covered loss, either may demand an appraisal. Under that process, each party selects an independent appraiser, and the appraisers jointly select an impartial "umpire." The appraisers then submit their differences to the umpire, after which "[w]ritten agreement . . . by any two of these three [individuals] sets the amount of the loss."

[2] Given First Rate's estimated cost of completely replacing the roofs, however, it seems unlikely the panel concluded roof replacement was appropriate.

### III.     Trout Brook attempts repairs

Following the appraisal, Trout Brook hired First Rate to complete the needed repairs.  But when it attempted to purchase the same shingles previously used on the roofs – Certain Teed XT-25 shingles in "weathered wood" color – it learned that they were no longer being manufactured.  Instead, Certain Teed had changed the shingles' "color blend" in January 2010, and it recommended that newly manufactured "weathered wood" shingles (now called XT-30) not be mixed with old ones in significant quantities due to the color difference.  Nevertheless, Trout Brook purchased several XT-30 shingles in "weathered wood" color to determine how they appeared next to the old shingles, but it concluded the colors were not a match.  It then contacted Harleysville to advise it of the situation, contending that the unavailability of color-matching shingles entitled it to complete roof replacement.  Harleysville responded by requesting more information, and Trout Brook forwarded a letter from Certain Teed advising of the color change and indicating that it had "no inventory of the old color product and [did] not know of any inventory in the field of the old color product in the XT series."

By letter dated March 26, 2012, Harleysville informed Trout Brook that it had "complied with all requirements of the appraisal process" and it would not "give further consideration to the issue" of color matching.  Trout Brook then retained counsel, who wrote Harleysville on April 11, 2012, asserting that "the problem of non-matching shingles was not considered by the 'appraisers' and, therefore, was not part of the loss valuation."  Counsel further noted that the Policy required the use of material "of *like*

*kind and quality*" or "*similar* materials on the same site," and non-matching shingles would not meet these terms.

Harleysville responded on June 8, 2012, asserting that under the Policy's "clear and unambiguous" language, it was required only to pay for property that had sustained "direct physical loss." Thus, it asserted it could not be required to pay for the replacement of *undamaged* roof shingles – even if they did not match the replacement shingles then available. Despite this assertion, however, it indicated it was "willing to conduct an inspection of the non-damaged shingles and any additional information [Trout Brook] may provide in support of [its] position." And because the Policy's "two (2) year suit limitation provision" was set to expire on June 25, 2012 – two years after the date of the second hailstorm – and in "light of [Trout Brook's] supplemental claim for additional damages, and Harleysville's request for further information and inspection," Harleysville agreed to extend the suit limitation period for 90 days, that is, to September 25, 2012.

Meanwhile, on June 27, 2012, another roof inspection took place. Jennae Majerus, Trout Brook's property manager, was present, along with Harleysville's claims adjuster (Christopher Bennett), Harleysville's appraiser (Brad Langerman), and Trout Brook's appraiser (Paul Norcia). Majerus brought new XT-30 shingles with her, and she overlaid them on one building's roof for color comparison. Unsurprisingly, the parties differed in their assessments – Langerman and Bennett believed the new shingles were "a good match" and "looked okay," while Majerus and Norcia believed that the new shingles simply did not match the color of those on the roof.

In August 2012, Harleysville offered to submit the "matching" issue to the appraisal panel that had rendered the prior award. Trout Brook refused. On September 11, 2012, Harleysville again offered to submit the "claim for additional roof coverage on a 'matching' theory to the same panel that entered the Appraisal Award." Though it disputed that an insured is entitled to multiple appraisals, it nevertheless recognized that Trout Brook's claim was "premised on the fact that in determining the 'amount of loss,' the Appraisal panel did not address the legal issue of 'matching.'" It was Harleysville's position, therefore, that the issue "must be resolved by the Appraisal panel" in the first instance. The insurer gave Trout Brook until October 1, 2012, to accept its offer of re-appraisal, and at the same time, it agreed to extend the Policy's suit limitation period for another 30 days, to October 25, 2012.

Trout Brook again demurred. On October 1, 2012, its counsel informed Harleysville that it would "not agree to the same appraisal 'panel,'" because the panel "did [not do] a very good job" and had "failed to submit any documentation as to how [it] reached [its] decision and what was considered in the decision making process."

**IV.    Litigation ensues, and "replacement" shingles are located**

A short time later, Trout Brook commenced this action in the Sherburne County, Minnesota District Court, seeking a declaration of coverage under the Policy for full roof replacement, as well as damages for Harleysville's (alleged) breach of contract. Harleysville later removed the action to this Court on diversity-jurisdiction grounds.

While undertaking discovery, one of Harleysville's expert witnesses, John Pederson, located and obtained a supply of XT-25 shingles in "weathered wood" color

- 6 -

that had been manufactured in 2009 – that is, before Certain Teed's color change. He offered the opinion that the shingles were essentially identical to the existing ones on the Trout Brook's roofs and could be used for repairs. Trout Brook, however, harbored concerns about using four-year-old shingles for repairs. Accordingly, it purchased one bundle of the shingles (26 total) from Pederson in order to examine them.[3]

Majerus inspected the shingles and was immediately troubled by their appearance – they had an "odd discoloration" making them appear "wet" in spots, and the discolored portions were "smoother than the rest of the shingle." Sue Broberg, Trout Brook's President, thought the shingles "look[ed] awful" and using them "would be like having an orange and a green next to each other." Norcia, who Trout Brook had retained as an expert in this case, also was concerned by the shingles. While he agreed with Pederson that they were the same composition, type, size, dimensions, and thickness as those on the roofs, he, too, believed they appeared "wet" and were not a color match. He also believed they were too brittle and needed additional testing to confirm they were suitable for repairs.[4] Ultimately, no repairs were completed with the shingles Pederson obtained.

---

[3] Pederson would not inform Trout Brook how many shingles he obtained, although he has submitted a Declaration averring he has "an amount sufficient to replace the shingles on the roofs of [Trout Brook's] buildings . . . according to [the] scope of damage identified in the Haag Engineering report." Trout Brook asserts in its brief, however, that Pederson "had about 96-98 bundles visible for inspection on two pallets, [but it] needs approximately 470-520 bundles to make repairs." (Mem. in Opp'n at 14.)

[4] John Russo, another Trout Brook expert, testified in his deposition that he believed the shingles were "probably appropriate" for repairs, but he also testified that "there is a question about whether they look the same . . . and that's something that's going to have to be dealt with."

With discovery now complete, Harleysville moves for summary judgment. Its Motion has been fully briefed, the Court heard oral argument on January 23, 2014, and the Motion is now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

**I.     Timeliness**

Citing the Minnesota Uniform Arbitration Act (MUAA), Minn. Stat. § 572B.22, Harleysville tees off its argument by asserting that Trout Brook did not challenge the appraisal award within 90 days and, accordingly, is barred from doing so now. (See Def.

Mem. at 12-15.) It further argues that absent a timely motion to modify or vacate, the Court "must" confirm the appraisal award. (Id.) But this argument is simply a red herring, as the appraisal award does not affect the disposition of the claims currently before the Court.

A review of the Complaint lays bare the problem with Harleysville's argument. While that pleading discusses the appraisal process and the underlying award when reciting the factual background in this case, *it does not challenge or otherwise seek to overturn the award*. Rather, in Count 1 Trout Brook seeks a declaration that Harleysville is required to pay for full roof replacement due to the "matching" issue (see Compl. ¶¶ 36, 45), and in Count 2 it asserts that Harleysville breached the Policy by failing to do so (id. ¶¶ 50-51). Furthermore, Harleysville nowhere asserted in its Answer (or through a counterclaim) that the award must be confirmed by the Court.

The reason for this is obvious. The appraisal panel only determined the cost of repairing Trout Brook's roofs – the "matching" issue was not before it, as it is undisputed Trout Brook did not learn Certain Teed had changed the color of XT-25 "weathered wood" shingles until *after* the appraisal award was rendered.[5] In fact, in correspondence to Trout Brook's counsel, Harleysville acknowledged the "matching" claim was "for *additional* damages" (Deutsch Decl. Ex. 10 (emphasis added)), and further noted that it was "premised on the fact that in determining the 'amount of loss,' the Appraisal panel

---

[5] Harleysville asserts that the appraisal panel "obviously concluded . . . there were shingles available to make the repairs." (Reply Mem. at 10.) At oral argument, however, its counsel acknowledged that the panel had simply *assumed* matching shingles were available. And that is consistent with Norcia's deposition testimony, in which he averred that the appraisers "certainly didn't consider . . . matching issues."

did not address the legal issue of 'matching'" (id. Ex. 11). And Harleysville did *not* assert in its letters that the claim had already been addressed by the appraisal panel and, consequently, was barred by a 90-day limitation period. Succinctly stated, whether the appraisal award is assailable at this juncture has no bearing on this case, because Trout Brook's claims raise an issue beyond the scope of that award: Is it entitled to coverage for roof replacement because matching shingles (allegedly) are not available?[6]

Bolstering the Court's conclusion is the fact that in Minnesota,[7] coverage questions are not for appraisers. While appraisers generally have authority "to decide the 'amount of loss,'" they "may not construe the policy or decide whether the insurer should pay." Quade v. Secura Ins., 814 N.W.2d 703, 706 (Minn. 2012). In other words, "[t]he scope of appraisal is limited to damage questions[,] while liability questions are reserved for the courts." Id. The issue currently before the Court, therefore, was not subject to the appraisal panel's authority and cannot be time-barred due to Trout Brook not challenging the appraisal award.

In any event, even if a 90-day limitation period were potentially applicable, the Court would conclude on the present record that there exists a genuine issue whether Harleysville is estopped from relying upon it. The record does not indicate that Trout Brook slept on its rights, but rather promptly brought the "matching" issue to Harleysville

---

[6] For the same reason, the Court finds misplaced Harleysville's request for confirmation of the appraisal award. Under the MUAA, which Harleysville argues is applicable to this case, confirmation is appropriate only "[i]f a motion to vacate an award is denied and a motion to modify or correct the award is not pending." Minn. Stat. § 572B.23(d).

[7] State law governs the interpretation of insurance policies, Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc., 346 F.3d 1160, 1164 (8th Cir. 2003), and the parties agree that Minnesota provides the relevant state law.

- 10 -

in September 2011, shortly after it was discovered. (See Deutsch Decl. Ex. 5.) In response, Harleysville did not invoke the (supposed) 90-day limitation period, but rather requested additional information, engaged in discussions with Trout Brook's counsel, reinspected the roofs, and most importantly, *twice extended the limitation period for Trout Brook to sue*. Such conduct, in the Court's view, would at least be sufficient to create a genuine issue whether Harleysville had "lull[ed] [Trout Brook] into inactivity." L&H Transp., Inc. v. Drew Agency, Inc., 403 N.W.2d 223, 227 (Minn. 1987); see also Brenner v. Nordby, 306 N.W.2d 126, 127 (Minn. 1981) (reversing summary judgment for defendant on statute-of-limitations grounds where plaintiff asserted that during negotiations, defendant never denied liability, told plaintiff he was investigating her claim, and represented that the investigation might lead to a settlement). Indeed, the Court strongly suspects that had Trout Brook sued to vacate the appraisal award before giving Harleysville an opportunity to address the matching issue, the insurer would have argued the suit was premature.

In sum, because the appraisal panel did not have before it the "matching" issue now at play in this lawsuit, and because questions of coverage are for the Court and not the appraisers, the award – and Trout Brook's failure to challenge it within 90 days – simply does not bar Trout Brook's causes of action.

**II.   Genuine issues of material fact exist**

As noted above, state law governs the interpretation of insurance policies. Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc., 346 F.3d 1160, 1164 (8th Cir. 2003). Under Minnesota law, interpretation of an insurance policy generally is a question

of law for the Court. Watson v. United Servs. Auto. Ass'n, 566 N.W.2d 683, 688 (Minn. 1997). When policy language is unambiguous, it is interpreted "in accordance with its plain and ordinary meaning." Ill. Farmers Ins. Co. v. Glass Serv. Co., 683 N.W.2d 792, 799 (Minn. 2004). Ambiguity in policy language, however, must be resolved in favor of the insured. Lott v. State Farm Fire & Cas. Co., 541 N.W.2d 304, 307 (Minn. 1995). "Ambiguity exists if the language of the policy is reasonably subject to more than one interpretation." Minn. Mining & Mfg. Co. v. Travelers Indem. Co., 457 N.W.2d 175, 179 (Minn. 1990).

The relevant Policy language here provides coverage for "direct physical loss" to "covered property." In the event of a loss to covered property, Harleysville is obligated to pay for the property's "replacement cost," defined as the lesser of (1) "the cost of repair or replacement with similar materials for the same use and purpose, on the same site" or (2) "the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable." According to Harleysville, these provisions unambiguously do not require replacement of Trout Brook's roofs. The Court disagrees.

### A. "Direct physical loss"

Seizing on the Policy language requiring "direct physical loss" to "covered property," Harleysville first argues that there cannot be coverage for *undamaged* shingles on Trout Brook's roofs – even if they do not match replacement shingles used for repairs. (See Def. Mem. at 17 ("Applying the plain language of the policy, the undamaged parts of the roof[s] did not sustain 'direct physical loss.'").) While superficially appealing, there at least are two problems with this argument.

First, it is predicated on an unsupported definition of the term "covered property." By Harleysville's logic, each individual roof shingle on Trout Brook's buildings constitutes "covered property," undermining any obligation to pay for shingles not damaged by hail. But in the Court's view, this reads the term "covered property" too narrowly. Harleysville points to no Policy definition supporting its argument, and in fact the Policy's "Property Covered" section indicates coverage extends to "*buildings and structures*." (Doc. No. 24 at 105 (emphasis added).) Moreover, the Policy's "location schedule," which defines the extent of Trout Brook's "property coverage," simply lists the association's eighteen buildings. (Id. at 32-34.) Accordingly, the Policy suggests that "covered property" is each of Trout Brook's *buildings*, and not individual items (such as shingles or siding) attached or appurtenant to them. And it is undisputed that each *building* sustained "direct physical loss" from the 2010 hail storm.

Second, recent Minnesota case law undermines Harleysville's argument. Just two months ago, the Minnesota Court of Appeals, in a case with strikingly similar facts to this one, held that an insurer was required to replace all of the siding on twenty townhome buildings, even though only a small portion was actually damaged in a hail storm, because the original siding was no longer manufactured in the same color. See Cedar Bluff Townhome Condo. Ass'n, Inc. v. Am. Family Mut. Ins. Co., No. A13-0124, 2013 WL 6223454, at *3-4 (Minn. Ct. App. Dec. 2, 2013). And there, as here, the policy required the insurer to pay only for "direct physical loss or damage to covered property." Id. at *1.

Harleysville retorts that Cedar Bluff erred and this Court should not propagate that error. (Def. Mem. at 22 ("[The] court of appeals completely ignored the threshold requirement in the policy before it – and in all property indemnity policies – that the property sustain some loss or damage before the insurer is required to replace it.").) But Cedar Bluff hardly broke new ground. Indeed, the Court of Appeals reached the same conclusion nearly two years earlier, in a case in which only a portion of the insured's roof was damaged by wind. Seamon v. Acuity, No. A11-429, 2011 WL 6015355, at *3-5 (Minn. Ct. App. Dec. 5, 2011) (reversing grant of summary judgment to insurer, because whether entire roof replacement was required under insured's policy when matching shingles were no longer available presented a jury question).[8]

Harleysville also argues that Cedar Bluff embodies bad public policy, because requiring roof replacement under these circumstances would "dramatically drive up premiums for the state's insureds." (Def. Mem. at 28; accord, e.g., Reply Mem. at 12-13.) But it is not this Court's role to decide what should, or should not, be the public policy of Minnesota. See, e.g., Twin Cities Galleries, LLC v. Media Arts Grp., Inc., 476 F.3d 598, 600-01 (8th Cir. 2007) (federal courts look to state statutes, rules, and court decisions to determine state public policy). And while Harleysville cites several *out-of-state* cases to bolster its argument (see Def. Mem. at 19 (collecting cases holding that "insurers are [not] obligated to replace undamaged materials simply to assure precise aesthetic matches")), this is far from a settled area of the law, and courts in different

---

[8] Rest Assured, Inc. v. American Motorist Insurance Co., No. C9-98-2302, 1999 WL 431112 (Minn. Ct. App. June 29, 1999), cited by Harleysville, is distinguishable because "matching" was not at issue.

states weigh the policy considerations differently.  See, e.g., Collins v. Allstate Ins. Co., No. 2:09-cv-01824, 2009 WL 4729901, at *6 n.4 (E.D. Pa. Dec. 10, 2009) ("[C]ases in other jurisdictions on the subject of 'matching' undamaged areas of a property to damaged areas are mixed.").  This is all the more reason why this federal Court cannot simply ignore Cedar Bluff (and Seamon) based on its own notions of what is "best" for Minnesota insureds.[9]

### B. "Like kind and quality"

Harleysville next notes that the Policy obligates it to pay Trout Brook only for the cost of repairing the roofs with "similar materials" or those of "like kind and quality" as already on the buildings.  (Def. Mem. at 24-30.)  And it argues that under this "unambiguous" language, it need not "pay the cost to replace *all* of the roofs on *all* of the buildings," because "like kind" and "similar" mean shingles "made of a similar substance and . . . similar in nature to [those] being replaced," which are "concept[s] completely divorced from color."  (Id. at 26 (emphases in original) (asserting that color "impacts neither the physical makeup (i.e., the composition) nor the quality or essential character of the shingles").)  Yet, "like" is commonly defined as "similar to," American Heritage Dictionary 731 (2d ed. 1985), and "similar" means "related *in appearance* or nature;

---

[9] Following oral argument, Harleysville's counsel submitted a "Bulletin" (attached to Doc. No. 36) from the Minnesota Department of Commerce, the entity that regulates the insurance industry in Minnesota, ostensibly supporting its position.  But that Bulletin actually *undermines* its argument.  The Bulletin provides that when only a portion of a roof is damaged and "existing materials cannot be 'reasonably' matched, the insurance company would have to replace the entire roof."  (Id.)  In other words, it indicates that an insurer may be required to pay for replacement of *undamaged* shingles if they do not match those available for repairs.  Moreover, the Bulletin suggests that Minnesota public policy supports requiring roof replacement in such circumstances.

alike though not identical," id. 1141 (emphasis added).[10]  Accordingly, the Court does not believe the terms "like kind" and "similar" can be so easily "divorced" from color.

Furthermore, the Minnesota Court of Appeals noted in Seamon that a policy provision requiring the use of "like" materials necessitated a determination whether repairs using unmatched shingles "would provide an acceptable *aesthetic* result."  2011 WL 6015355, at *4 (emphasis added).   Similarly, the policy in Cedar Bluff required the use of materials "of like kind and quality," language the insurer argued would be "unreasonable to interpret . . . to require replacement of both damaged and undamaged siding in order to achieve an exact color match."  2013 WL 6223454, at *4.  But the court noted the policy did not define the phrase "of like kind and quality," and the insured's interpretation – "requir[ing] that the buildings have uniformly colored siding" – was no less reasonable.  Id.  Because there were multiple reasonable interpretations, the policy was ambiguous and could not be resolved as a matter of law in the insurer's favor.  Id.

This Court perceives no principled reason to deviate from these holdings.   The terms "similar materials" and "material of like kind and quality" simply cannot be defined, as a matter of law, to preclude consideration of color.  Rather, a jury must determine whether these terms obligate Harleysville to pay for matching shingles on Trout Brook's property.  See Seamon, 2011 WL 6015355, at *4-5.

---

[10] Because insurance policy language is interpreted "in accordance with its plain and ordinary meaning," Ill. Farmers Ins., 683 N.W.2d at 799, Minnesota courts routinely resort to dictionary definitions to ascertain the meaning of undefined policy terms, see, e.g., Carlson v. Allstate Ins. Co., 749 N.W.2d 41, 45-46 (Minn. 2008); see also Javinsky v. Hartford Life Ins. Co., Civ. No. 09-888, 2010 WL 889961, at *4 (D. Minn. Mar. 8, 2010) (Montgomery, J.) (collecting cases).

Harleysville also argues that even if color matching is required, it has "fulfilled all of its obligations" under the Policy because it "located replacement shingles that are identical to the existing [ones]." (Def. Mem. at 23.) Putting aside that the record does not reveal whether Pederson obtained a sufficient number of shingles to complete all necessary repairs, it is far from clear that the shingles are "identical" to those on Trout Brook's roofs. To be sure, they are the same "weathered wood" Certain Teed X-25 model as those on the roofs, but several witnesses testified in their depositions that the shingles located by Pederson – whether due to time, fading, exposure to water, or some other unknown reason – simply do not match the existing ones. Moreover, the parties have submitted pictures of the newly located shingles overlaid on a Trout Brook roof, and in the Court's view a reasonable jury could conclude that the colors are not "similar." And, although testing of a small sample showed that the newly obtained shingles adhered adequately, several of Trout Brook's witnesses testified that the shingles are brittle and crack easily. Under these facts, whether Pederson's replacement shingles are of "like kind and quality" is a disputed fact that cannot be resolved at summary judgment.[11]

---

[11] Harleysville notes that the Policy only requires it to provide "similar" or "like" materials "*to the extent practicable*." (Reply Mem. at 13 (emphasis added).) But in the Court's view this adds little to the mix, because what is "practicable" under the circumstances is far from evident, especially given that the scope of the roof damage is not clearly spelled out in the parties' Motion papers. Indeed, Norcia testified in his deposition that approximately 12,000 shingles would be needed to complete repairs, and hence a jury could determine under the circumstances that it is "practicable" to require complete roof replacement.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Harleysville's Motion to Confirm the Appraisal Award and for Summary Judgment (Doc. No. 29) is **DENIED**.

Dated: February 5, 2014                              s/Richard H.  Kyle
                                                                                   RICHARD H. KYLE
                                                                                   United States District Judge